

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00662-CV

Melissa **FUENTES**, Individually, and as Next Friend of Victor Robert Fuentes and Isabella
Elaine Fuentes, Minors,
Appellant

v.

**TEXAS MUTUAL INSURANCE CO.**,
Appellee

From the 112th Judicial District Court, Sutton County, Texas
Trial Court No. 5910
Honorable Pedro Gomez, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Irene Rios, Justice

Delivered and Filed:  November 1, 2017

AFFIRMED

In the underlying proceedings, Melissa Fuentes filed a death benefits claim arising from

the death of her husband, Robert Estrada.  Texas Mutual Insurance Company denied the claim,

and Fuentes sought administrative review by the Texas Department of Insurance, Division of

Workers' Compensation ("DWC").  After both the DWC contested case hearing officer and the

DWC appeals panel agreed with Texas Mutual, Fuentes sought judicial review in district court.

At trial, Fuentes and Texas Mutual filed competing motions for summary judgment.  The trial

court granted Texas Mutual's motion, denied Fuentes's motion, and Fuentes now appeals.  The

dispositive issue in the proceedings below and on appeal is whether Estrada was in the course and scope of his employment when he was killed in an automobile accident while driving from his home to his employer's office. We affirm.

## BACKGROUND

The parties filed the following stipulated facts in the trial court. Bryant Electric, Inc. employed Estrada on the date of the fatal accident. Texas Mutual provided workers' compensation insurance coverage to Bryant Electric. Estrada lived in Sonora, Texas; and Bryant Electric's office is located in San Angelo, Texas. Bryant Electric hired Estrada to work at its jobsite located at Goodfellow Air Force Base in San Angelo, Texas. In addition to an hourly wage, Bryant Electric paid Estrada a $75 per week stipend. Bryant Electric did not require or maintain records on how its employees spent their stipends.

Estrada worked as a foreman, and his job duties included laying out the day's work, overseeing his crew, answering questions, scheduling material deliveries, tracking employee time, and submitting crew timesheets to Bryant Electric. Bryant Electric allowed Estrada to submit the timesheets in one of three ways: (1) by use of a fax machine located at Goodfellow, (2) give them to Dial Ortiz, another Bryant Electric employee, who made daily trips between the office and Goodfellow, or (3) hand deliver the sheets to an inbox at Bryant Electric's office. Bryant Electric ran its payroll every Thursday morning.

Estrada's usual route to work was to drive north on U.S. Highway 277 from his house to Bryant Electric's office or past the offices directly to Goodfellow. On the morning of Thursday, November 1, 2012, Estrada left his house, and was travelling on Highway 277 when an oncoming vehicle struck Estrada's vehicle head-on, resulting in Estrada's death. The accident occurred between Estrada's residence and about one mile south of Bryant Electric's office.

Fuentes later filed a workers' compensation claim seeking death benefits as Estrada's surviving common-law wife. After Texas Mutual denied the claim, Fuentes initiated a contested case proceeding before the DWC. The sole issue before the DWC hearing officer was whether Estrada "sustain[ed] a compensable injury on November 1, 2012, resulting in his death." The hearing officer entered the following findings of fact: Estrada's "transportation to the office and to the worksite was not furnished or paid for by his employer"; his "travel to the office or to the worksite from his home was not pursuant to an express or implied requirement of his employment contract"; at the time of his fatal injury, Estrada "was not directed by his employer to proceed from one place to another (from his home to the company office or to the worksite) and was not on a special mission of the employer"; and Estrada "did not sustain his fatal injury while in the course and scope of his employment with his employer." The hearing officer concluded Estrada "did not sustain a compensable injury on November 1, 2012, resulting in his death." Therefore, the hearing officer ordered that Texas Mutual was not liable for benefits. Fuentes then requested review by the DWC appeals panel, which affirmed the hearing officer's decision.

Fuentes subsequently sought judicial review in district court, and the parties filed competing motions for summary judgment. In her motion for summary judgment, Fuentes argued that, at the time of his death, Estrada was furthering Bryant Electric's affairs, Estrada's work originated in Bryant Electric's business, and Bryant Electric paid for Estrada's transportation to and from work. In its motion for summary judgment, Texas Mutual argued Estrada's travel to work did not originate in Bryant Electric's business, and the "coming-and-going" rule precluded recovery for Estrada's death during his commute to work. Texas Mutual also argued Fuentes did not raise the "paid transportation" argument before the DWC; therefore, the trial court lacked jurisdiction to consider that argument. The trial court granted Texas Mutual's motion for summary judgment and denied Fuentes's motion for summary judgment.

**STANDARD OF REVIEW**

We apply the same standards of review to appeals from workers' compensation panel decisions as we do to appeals in other civil cases. *Safford v. Cigna Ins. Co. of Tex.*, 983 S.W.2d 317, 319 (Tex. App.—Fort Worth 1998, pet. denied). We review a trial court's granting of a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *Id.*; *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005).[1] Each party bears the burden of establishing it is entitled to judgment as a matter of law. *City of Santa Fe v. Boudreaux*, 256 S.W.3d 819, 822 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In reviewing a traditional summary judgment, we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

If we determine the trial court erred, we render the judgment the trial court should have rendered. *Valence Operating*, 164 S.W.3d at 661; *FM Props.*, 22 S.W.3d at 872. If, as here, the trial court's order does not specify the grounds for its summary judgment ruling, we affirm the

---

[1] Fuentes moved for a traditional summary judgment. Texas Mutual entitled its motion as a motion for both a traditional and a no-evidence summary judgment. However, the entirety of its motion relies on evidence it submitted in support of a traditional summary judgment and nowhere in its motion did Texas Mutual state the elements of Fuentes's claim as to which there was no evidence. *See* TEX. R CIV. P. 166a(i) ("The motion must state the elements as to which there is no evidence."). Therefore, Texas Mutual sought only a traditional summary judgment, and to the extent the trial court rendered a no-evidence summary judgment in favor of Texas Mutual, the trial court erred.

summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

## LIABILITY FOR COMPENSATION

"An insurance carrier is liable for compensation for an employee's injury without regard to fault or negligence if: (1) at the time of injury, the employee is subject to this subtitle; and (2) the injury arises out of and in the course and scope of employment." TEX. LABOR CODE ANN. § 406.031(a) (West 2015); *see also* TEX. LABOR CODE § 401.011(10) ("'Compensable injury' means an injury that arises out of and in the course and scope of employment for which compensation is payable under this subtitle."). The Labor Code defines "course and scope of employment" to mean

> an activity of any kind or character that has to do with and originates in the work, business, trade, or profession of the employer and that is performed by an employee while engaged in or about the furtherance of the affairs or business of the employer. The term includes an activity conducted on the premises of the employer or at other locations.

*Id.* § 401.011(12).

There are two exclusions to when an employee's activity is considered in the course and scope of an employee's work: (1) the coming and going exclusion, which excludes "transportation to and from the place of employment," and (2) the dual purpose exclusion, which excludes "travel by the employee in the furtherance of the affairs or business of the employer if the travel is also in furtherance of personal or private affairs of the employee."[2] *Id.* § 401.011(12)(A),(B). If an exclusion applies, then the employee's activity is not in the course and scope of employment unless an exception to the exclusion applies. *Am. Cas. Co. of Reading, Pa. v. Bushman*, 480 S.W.3d 480,

---

[2] In this case, neither party argued the dual purpose exclusion applies.

673-74 (Tex. App.—San Antonio 2015, no pet.).  The coming and going exclusion does not apply if one of the three exceptions listed in section 401.011(12)(A) applies.  The only exception on which Fuentes relied at trial was the so-called paid transportation exception, which applies if "the [employee's] transportation is furnished as a part of the contract of employment or is paid for by the employer."  TEX. LABOR CODE § 401.011(12)(A).

Determining whether an activity is in the course and scope of employment involves a three-step analysis.  *Bushman*, 480 S.W.3d at 673.  The first step requires determining whether the activity (1) originates in the employer's work, business, trade, or profession and (2) furthers the employer's affairs.  *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 642 (Tex. 2015); *Bushman*, 480 S.W.3d at 673.  Because we conclude this first step is dispositive, we do not address the second step (application of the coming and going exclusion) or the third step (application of the paid transportation exception).

### FURTHERANCE AND ORIGINATION COMPONENTS

The definition of "course and scope of employment," has two components: the injury had to (1) relate to or originate in, and (2) occur in the furtherance of, the employer's business.  *Leordeanu v. Am. Prot. Ins. Co.*, 330 S.W.3d 239, 241 (Tex. 2010).  Both components must be satisfied.  *Id.*  "An employee's travel to and from work makes employment possible and thus furthers the employer's business," which satisfies the second component of the definition.  *Id.* at 242.  But, such travel "cannot ordinarily be said to originate in the [employer's] business, the requirement of the first component, because '[t]he risks to which employees are exposed while traveling to and from work are shared by society as a whole and do not arise as a result of the work of employers.'"  *Id.* (citation omitted).

Here, there appears to be no dispute Estrada was travelling to Bryant Electric's office on his way to the Goodfellow jobsite at the time of the accident.  Therefore, his travel furthered Bryant

Electric's affairs. However, we must also examine whether the origination component is satisfied. The origination component is satisfied if the employee's travel was "pursuant to express or implied conditions of his employment contract." *Meyer v. W. Fire Ins. Co.*, 425 S.W.2d 628, 629 (Tex. 1968); *see also SeaBright Ins.*, 465 S.W.3d at 642 (quoting *Meyer*). The *Meyer* Court noted this provision includes those situations in which the employee proceeds from one place to another under the terms of an employment that expressly or impliedly requires that he do so to discharge the duties of his employment. *Meyer*, 425 S.W.2d at 630.

The Texas Supreme Court has noted several factors that reflect on whether an employee's travel originates in the employer's business or work, including: (1) whether the employment contract expressly or impliedly required the travel involved; (2) whether the employer furnished the transportation; (3) whether the employee was traveling on a special mission for the employer; and (4) whether the travel was at the direction of the employer, such as requiring the employee to bring tools or other employees to work or another location. *SeaBright Ins. Co.*, 465 S.W.3d at 647 (Johnson, J., dissenting). Courts generally employ a fact-intensive analysis to determine whether an employee's travel originated in the employer's business, focusing on the nature of the employee's job, the circumstances of the travel, and any other relevant facts. *Id.* at 642-43. For example, evidence that the employer provided or paid for the transportation is probative of whether the employee's trip originated in his employer's business. *Bushman*, 480 S.W.3d at 674. However, an employer's mere gratuitous furnishing or paying transportation as an accommodation to its employee and not as an integral part of the employment contract does not by itself render an injury occurring during such transportation compensable. *Zurich Am. Ins. Co. v. McVey*, 339 S.W.3d 724, 730 (Tex. App.—Austin 2011, pet. denied). In other words, employer-provided transportation that amounts to a necessity from the employer's perspective, and not just an accommodation to the employee, may be sufficient to prove travel originated in the employer's

business. *Id.* "No singular fact is necessarily dispositive."[3] *Id.* Our starting point in analyzing the origination component is to determine the nature of Bryant Electric's business. *See SeaBright Ins.*, 465 S.W.3d at 643; *Bushman*, 480 S.W.3d at 675.

Bryant Electric is an electrical contractor that does new construction and remodeling/repair of residential, commercial, and institutional facilities. The company employs several foremen who supervise work on different projects at different jobsites, and the company employs about twenty-five electricians, at different experience levels, who work at the various jobsites. The only employees who drive company-owned vehicles are the service employees, who go job to job and need a truck with signage, or employees who work at out-of-town jobsites. From the evidence in the record, we conclude Bryant Electric's business called for employing electricians to work at their various jobsites.

We next address the nature of Estrada's employment. *See SeaBright Ins.*, 465 S.W.3d at 644. Sometime in 2001, the company began electrical work at a new dormitory located at Goodfellow Air Force Base. Terry Bader, who co-owns Bryant Electric with his wife and acts as the day-to-day manager of the company, testified the Goodfellow project was one of Bryant Electric's largest and was technically demanding. The Goodfellow project was just one of several on-going projects, which presented a staffing problem for Bryant Electric. As a result, the company hired electricians from other Texas cities to work at the Goodfellow jobsite in San

---

[3] In *Bushman*, this court considered American Casualty's argument that facts supporting exceptions to the coming and going exclusion, such as considerations of the paid transportation exception or the special-mission exception, were irrelevant to the consideration of the origination component. *Bushman*, 480 S.W.3d at 674. The court disagreed, noting the Supreme Court in *SeaBright Insurance Co.* cited to cases applying such facts, and explaining "[c]ourts have generally employed a fact-intensive analysis to determine whether an employee's travel originated in the employer's business, focusing on the nature of the employee's job, the circumstances of the travel, and any other relevant facts." *Id.* (quoting *SeaBright Ins. Co.*, 465 S.W.3d at 642-43). Therefore, although paid transportation and special mission are separate exceptions to the coming and going exclusion, evidence that an employer furnished or paid for an employee's transportation or evidence that the employee was on a special mission for his employer may also be considered in a fact-intensive analysis of whether an employee's injury originated in the employer's business.

Angelo. Estrada was one such employee. When he was first hired, Estrada commuted to Goodfellow from his home in Abilene. He was not originally hired to be a foreman, but was later promoted to that position after the original foreman unexpectedly quit. Bryant Electric discouraged its electricians from making supply runs or picking up supplies. Instead, Estrada, as foreman, would call for any material he needed and the company's warehouseman (Dial Ortiz) delivered the materials to the jobsite.

Bryant Electric did not require any electrician or foreman to start and end their work day at the office. Instead, they began their workday at the jobsite. The only employees who started their workday at the office were the service electricians who did not have regular jobsites and needed to come to the office for their dispatches. Bryant Electric paid its employees an hourly wage, the workweek ran Thursday morning through quitting time the following Wednesday, and employees were paid on Friday. Depending on the circumstances, Bryant Electric paid some employees a per diem in addition to their hourly wage. For example, if an employee worked at an out-of-town jobsite, the company paid for a hotel room if an overnight stay was required, provided a credit card to pay for fuel, and paid a $25 daily per diem for other expenses. No employee was paid during their commute to or from work, unless they were required to work at an out-of-town jobsite. For example, if an employee who lived in San Angelo was required to travel from San Angelo to a project in another city, then Bryant Electric paid that employee for his travel time. On the other hand, employees who travelled to a jobsite from their own out-of-town home would not be paid for travel time. Bader said the only exception to this would be if an employee had to travel from the jobsite to the office during the workday, in which case, the employee would be paid for travel time. But, as Bader explained, "When they're off the clock — When they're not working, they are off the clock and that's it."

Bryant Electric hired Estrada to work at the Goodfellow jobsite and he did not work at any of the company's projects located at other jobsites. Estrada's hourly wage began when he reported to the office or to the jobsite, and he was "scripted to be at the jobsite by 7:00[a.m.]." When he was first hired, Estrada and his family lived in Abilene. At some point in time, Estrada and his family moved to Sonora to be closer to extended family. Sonora is about ninety miles south of San Angelo. Bader said the understanding when Estrada was hired was that Goodfellow was his jobsite and he would not be paid to travel from his home to the site. When Estrada first began work for the company, he reported directly to the Goodfellow jobsite. After he became the foreman, Estrada generally reported to the jobsite, but because he passed the company office on his way from his home to Goodfellow, he could stop by the office if he needed to. Because the accident occurred on a Thursday—the day time sheets were due to be turned in—and the time sheets had not yet been turned in, both Bader and Fuentes believed Estrada had the time sheets with him in his truck when the accident occurred. Therefore, it appears undisputed that Estrada was driving from his house to the office, before he went to Goodfellow.

Bader stated Estrada was not a travelling serviceman, he was not required to travel for his work, and when asked if he was a "journeyman electrician," Bader responded that Estrada "was an apprentice electrician." Bader said he discouraged employees from leaving their jobsite, "[e]specially someone in [Estrada's] position, because he was — that's who everyone went to to ask questions, and if he wasn't there, things didn't get done." Estrada could use any of the alternate means to submit his work crew's timesheets to the office, and Bryant Electric never instructed him to personally deliver the time sheets to the office. Bader stated the company never required Estrada to stop by the office before he went to the jobsite, but it was possible Estrada may have initiated an office meeting with the company's operations manager if Estrada had a question and he knew

the manager would be in the office. Bader also said the company did not instruct Estrada, or exert any influence over him, regarding his route to work or to the jobsite.

Estrada did not drive a company vehicle, he used his own truck to commute to and from work, and he was not paid for his mileage or other car-related expenses such as insurance. However, Bryant Electric paid Estrada a $75 per week stipend. Bader said there were not enough electricians in San Angelo and the company had to hire electricians, such as Estrada, from out of town to work at Goodfellow. Bader testified he did not know how Estrada used the stipend, and Estrada was not required to submit receipts. Bader explained that when Estrada first started with the company, Estrada and another employee car-pooled to work from Abilene where they both lived at the time. When the car-pooling stopped, Estrada asked the company to help him with his fuel expenses, and the company elected to give him the weekly stipend because the company considered Estrada a valued employee.[4] His weekly stipend was not tied to the number of hours he worked or to any actual expenses he may have incurred, and he worked only at the Goodfellow jobsite. When asked if he had any personal knowledge regarding how Estrada used his weekly stipend, Bader replied, "I have no earthly idea. I assume it was gasoline, but I don't know."

Bader said the use of a stipend is up to the employee, "[s]ome use it for gasoline. Some of them use it for food. Just, you know, whatever. That's their choice." Bryant Electric did not maintain any documentation on which employees received a weekly stipend or the reason they might receive such a stipend, and the company did not have any written travel policies.

Fuentes testified her husband was paid the stipend "to help with gas, since he was driving." She said her husband normally went directly to Goodfellow, but on Thursdays he would stop by the office on his way to Goodfellow. She said he usually left the house between 5:30 a.m. and

---

[4] Bader testified that when the Goodfellow project was complete, the company would have found another project for Estrada.

6:00 a.m. to arrive at Goodfellow by 7:00 a.m. when his workday began, and on Thursdays, he would stop by the office to turn in time sheets before he went to the Goodfellow jobsite.

Because we have already determined Estrada's travel furthered Bryant Electric's business, Estrada was in the course and scope of his employment if the relationship between his travel and his employment was so close that the injury had to do with and originated in Bryant Electric's work, business, trade or profession. *See SeaBright Ins. Co.*, 465 S.W.3d at 642. This inquiry is satisfied if Estrada's travel was "pursuant to express or implied conditions of his employment contract." *Id.*; *Meyer*, 425 S.W.2d at 629. Two cases provide some guidance on this inquiry.

The court in *U.S. Fire Insurance Co. v. Brown*, 654 S.W.2d 566 (Tex. App.—Waco 1983, no writ), concluded the employee (Brown) traveled on the public highways pursuant to express or implied requirements of his employment contract, and the very nature of the employer's business and of Brown's duties demanded that he frequently be on the highways. *Id.* at 569. The court noted, "Brown's work situation was different from that of the ordinary employee who travels each day to a specific location to begin work in that Brown's duties required his traveling almost every day to seven different hospitals located in six different counties." *Id.* Under the undisputed facts of the summary judgment record, Brown was not simply on his way to work at the time of his injuries, although his hourly rate did not begin until he reached Meridian Hospital. The court held Brown's agreement to travel in his automobile from his home in Troy to any one of seven hospitals assigned to him by Homemakers was an integral part of his employment contract, and he began execution of this part of his job duties when he left his home on direct route to Meridian Hospital. *Id.*

In *Bushman*, the employer (Salem) instructed Clayton, who lived in Seguin, to report to Elgin and work there for a week to train a new dispatcher. *Bushman*, 480 S.W.3d at 675. Although he primarily worked as a Salem truck driver in San Antonio, Clayton had on a few prior occasions

worked as a dispatcher, but never as a dispatcher trainer. Salem did not ordinarily reimburse Clayton for travel from his home in Seguin to the truck yard in the San Antonio area, but Salem would reimburse Clayton his expenses for traveling from Seguin to Elgin and his lodging expenses if he chose to stay overnight in Elgin. On the day of the accident, Clayton was traveling to Elgin and his travel was necessary if Clayton was to perform his job as his employer had instructed. Clayton was not traveling to Elgin by his own choice but was required to go and perform a job outside of his ordinary job duties and away from his ordinary job site. The *Bushman* court held the evidence established Clayton's required work travel to Elgin to train a dispatcher originated in Salem's work, business, trade, or profession. *Id.*

Although Estrada lived in Sonora, and Bryant Electric's office and the Goodfellow jobsite were in San Angelo, Estrada did not travel to or between several jobsites. He was assigned only to the Goodfellow jobsite, and his pay began when he arrived at that jobsite. Estrada was fatally injured while travelling from his home to Bryant Electric's office on his way to Goodfellow. However, there is no evidence, or a genuine issue of material fact, that any implied employment contract required Estrada to first stop at the office on the date of the accident before travelling to the Goodfellow jobsite.

Another factor is whether any employer-provided transportation amounts to a necessity from the employer's perspective, and not just an accommodation to the employee. *Zurich Am. Ins.*, 339 S.W.3d at 730. There is no dispute that Bryant Electric did not furnish Estrada with transportation or that Bryant Electric did not direct or otherwise influence Estrada's route to work. Although Estrada may have used his stipend to pay for gasoline, there is no evidence Bryant Electric required him to use the money for that purpose, or for any other specific purpose. To the extent Estrada may have used his stipend to pay for gas, there is no evidence the stipend amounted

to a necessity from his employer's perspective. Instead, as Bader testified, the stipend was an accommodation to Estrada.

Finally, evidence that an employee was on a "special mission" for his employer is also probative of whether an employee's trip originated in his employer's business. *SeaBright Ins. Co.*, 465 S.W.3d at 647. "The term special mission eludes precise definition but, in essence, is shorthand for trips made by an employee under the direction and for the benefit of the employer." *Zurich Am. Ins.*, 339 S.W.3d at 730. Although Fuentes testified her husband left the house early on Thursdays to stop by the office to submit the timesheets, a time change alone is not sufficient to transform a trip into a "special mission." *Evans v. Ill. Emp'r Ins. of Wausau*, 790 S.W.2d 302, 304 (Tex. 1990). Also, an employee "can have more than one fixed place of employment and that fixed place of employment can change according to the nature of his work." *Id.* (quoting *Bissett v. Tex. Emp'rs Ins. Ass'n*, 704 S.W.2d 335, 338 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.)). In *Evans*, the jobsite was located six miles north of Tioga, Texas, at an area known as Range Creek. A provision in the contract required all personnel working on the job to attend safety meetings held every Monday morning in a trailer located one and one-half miles south of Tioga. On the Friday before the accident, Larry Brawdy and James Evans, who were carpenters on the job, were instructed by their supervisor to attend the safety meeting at 7:30 a.m. on the following Monday morning, at which time their pay began. With Evans as a passenger, Brawdy was driving directly to the meeting at approximately 7:20 a.m. when a collision with a train rendered him a quadriplegic and killed Evans. The Texas Supreme Court concluded that all employees were required to attend the regularly scheduled safety meetings as a part of their employment; therefore, attendance was an integral part of the job, and not a special mission, and travel to the safety meeting was simply travel to work. *Id.* at 304. The Court held

Had Brawdy and Evans been injured while en route from the safety meeting to the primary work site (at Range Creek), these injuries would have been covered by the Act. However, since neither of them had begun work, their injuries fall squarely within the "coming and going" rule and they are thereby precluded from recovering workers' compensation benefits. If other factors are not found to be special, then the employee must have been actually working as he traveled down the road in order for an injury to be compensable. The safety meetings were not "special missions" but rather a regularly scheduled part of each employee's job.

Railroad Builders neither supplied the transportation, compensated employees for transportation time to the safety meetings, specified the route to be taken by Brawdy and Evans, nor was aware of the route normally taken by Brawdy and Evans. . . . .

The risks to which employees are exposed while traveling to and from work are shared by society as a whole and do not arise as a result of the work of employers. [citation omitted] Because Brawdy and Evans were outside the scope of employment—merely being on their way to work at the time of the accident—we affirm the decision of the court of appeals.

*Id.* at 305.

Here, submitting time sheets was a required part of Estrada's job and not a "special mission." Estrada may have left his house early enough to allow him the extra time to stop at the office on his way to Goodfellow; however, Bryant Electric did not require him to submit the paperwork at its office. Estrada could have used the fax machine located at the Goodfellow jobsite or he could have sent the timesheets with Dial Ortiz who made daily trips between Goodfellow and the office. Instead, he chose to stop by the office on Thursdays while en route to Goodfellow. As in *Evans*, there is no evidence, or a genuine issue of material fact, that Estrada was actually working as he travelled to the Bryant Electric office or that he had begun work at the time of the accident.

**CONCLUSION**

Although Fuentes characterizes Estrada as a "field electrician" who was directed to travel out of town to locations away from his employer's premises, there is no evidence Estrada travelled to more than one jobsite. Estrada travelled only from his home to the Goodfellow jobsite, with

perhaps weekly stops at the office for his own convenience to drop off the timesheets, and his stipend was a mere accommodation and not an integral part of his employment contract. Therefore, although Estrada's travel furthered Bryant Electric's work, we conclude Texas Mutual conclusively established Estrada's choice to stop at the office en route to the Goodfellow jobsite on the day of the accident did not originate in Bryant Electric's business. Accordingly, the trial court properly rendered summary judgment in favor of Texas Mutual on the ground that Estrada's travel was not in the course and scope of his employment.[5] For these reasons, we affirm the trial court's summary judgment in favor of Texas Mutual.

Irene Rios, Justice

---

[5] Because we conclude Estrada's travel was not in the course and scope of his employment, we need not address whether any exclusion or exception applies. We also need not address whether the trial court properly denied Fuentes's motion for summary judgment.